UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                        Case No. 19-20518
v.                       District Judge Victoria A. Roberts
                       Mag. Judge R. Steven Whalen

ANTONIO LAMONT ARRINGTON,

        Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED IN VIOLATION OF HIS FOURTH AMENDMENT RIGHTS [ECF No. 24] AND GRANTING DEFENDANT'S MOTION TO SUPPRESS POST-ARREST STATEMENTS [ECF No. 25]

## I.    INTRODUCTION

On May 7, 2019, Blackman-Leoni Township officers ("officers") arrested Antonio Arrington ("Arrington") after a search in connection with a traffic stop revealed crack cocaine and a weapon in Arrington's possession.

The United States charged Arrington with: (i) possession with intent to distribute a controlled substance (cocaine base), in violation of 18 U.S.C. § 841(a)(1); (ii) felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and (iii) possession of a firearm in furtherance of a drug trafficking scheme, in violation of 18 U.S.C. § 924(c)(1)(A).

Before the Court are Arrington's Motions to Suppress: (1) Evidence Based on Illegal Search and Seizure [ECF No. 24]; and (2) Post Arrest Statements [ECF No. 25].

Based upon the testimony and evidence presented at the evidentiary hearing held on January 31, 2020, the Court finds the unconstitutional detention of Arrington tainted the search, making the evidence seized in the search inadmissible.

The Court **GRANTS** Arrington's Motions.

## II.    BACKGROUND

On May 7, 2019, Officers Chandler Fryt ("Fryt") and Alec Norris ("Norris") were in marked cars and on routine traffic duty. They staked out a hotel in a high crime area in Jackson, Michigan. Fryt testified that officers would often investigate cars driving up Andrew Street, which bordered the hotel, because the area is plagued by drugs, assaults, and human trafficking from the hotel. While Fryt and Norris were parked in their patrol cars window to window, they observed a Windstar van on Andrew Street at 3:00 a.m. The Windstar did not come from the hotel parking lot.

Fryt followed the Windstar and attempted to verify its license plate. The law enforcement database showed that the plate was registered to a different

vehicle – a Chevy Silverado. Fryt testified that – in his experience – an improper plate is often indicative of another traffic infraction or other criminal activity. Fryt prepared to stop the Windstar. Before he activated his lights to initiate the stop, the Windstar reached its destination – a house on Dewey Street. After the van pulled into the driveway and stopped, Arrington exited the front passenger seat and walked to the front door of the house.

After Arrington exited the Windstar, Fryt pulled his car into the driveway behind the Windstar and initiated a traffic stop. The driver exited the van and approached the patrol car. Fryt spoke with the driver in the driveway. The driver told Fryt that Arrington called him for a ride because Arrington said he was intoxicated.

Fryt says that Arrington's exit from the vehicle was suspicious to him; he felt that "something else may be going on" because most people stay in the car when officers initiate a traffic stop. Importantly, the home where the van stopped was the location that Arrington intended to go that evening, and Arrington exited before Fryt initiated the traffic stop.

Fryt spoke with the driver. He gave Fryt his license and car title. In the meantime, Arrington knocked on the front door of the house. Fryt then approached Arrington and asked for identification. Arrington stated that he

did not have identification, but said his name was "Tony Smith." Fryt asked Arrington for his middle name; Arrington gave two different spellings ("Lomant" and "Lamont"), but immediately corrected his spelling error. Fryt said this was suspicious as well. Arrington stated that he was nervous. Fyrt wrote down the name and date of birth Arrington gave him. While Fryt spoke with Arrington, Norris arrived. Arrington was on the porch when Norris arrived.

Fryt returned to his patrol car to verify the information he received and to search for any outstanding warrants. Meanwhile, Norris began to question Arrington to "make conversation." The police encounter which has the most significance for purposes of this Court's ruling was between Norris and Arrington. The Court discusses that below.

## III.   ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

Arrington argues officers violated his Fourth Amendment rights when they arrested and subsequently searched him because they did not have "probable cause or articulable suspicion that he was engaged in criminal activity at the time of his arrest." He says the Court must suppress all evidence obtained as fruit of an illegal search and seizure.

The Government says officers developed reasonable suspicion that Arrington was engaged in criminal activity during the traffic stop, which justified continued questioning.

## A. Evaluating a Fourth Amendment Challenge in the Context of a Traffic Stop

The stop and detention of a motorist is a seizure under the Fourth Amendment. *United States v. Waldon,* 206 F.3d 597, 602 (6th Cir. 2000); *United States v. Arvizu,* 534 U.S. 266, 273 (2002). A routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *Arizona v. Johnson*, 555 U.S. 323, 330 (2009); *Unites States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014). Passengers are considered seized during a traffic stop and have all the rights that are extended to the driver to challenge that seizure and evidence

obtained. *Brendlin v. California,* 551 U.S. 249, 263 (2007); *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012).

For a seizure to withstand Fourth Amendment scrutiny, the Court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion." *United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir. 1986), *cert. denied,* 479 U.S. 1097 (1987).

If the traffic stop is properly based, the Court must next assess "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.*

**B. Arrington Does Not Challenge the Legality of the Initial Stop But Contests the Investigation of Him**

At the outset of the hearing, counsel for Arrington stated that his client did not challenge the lawfulness of the initial traffic stop. Based on the testimony given by Fryt, it appears there would be no basis for such a challenge.

When officers stop a vehicle – regardless of the duration and purpose of the stop – it must comport with the Fourth Amendment requirement of reasonableness. *Whren v. United States,* 517 U.S. 806, 810 (1996). "An automobile stop is considered reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Copeland,* 321 F.3d 582, 592 (6th Cir. 2003). Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir. 1993). The subjective motives or intentions of a police officer are not relevant. *Whren,* 517 U.S. at 813.

Fryt had every right to put the license plate into the data system, and the discovery of an invalid license plate constituted probable cause to stop the driver for a traffic violation. Under Michigan law, "a person shall not operate . . . a vehicle . . . unless there is attached to and displayed on the vehicle, as required by this chapter, a valid registration plate issued for the vehicle by the department for the current registration year." M.C.L. § 257.255(1). The circumstances here gave Fryt probable cause to stop the Windstar.

However, Arrington contends that the decision to stop the Windstar for an improper plate did not justify an investigation of him. And, he argues that

nothing about his exit from the van and walk to the front porch of the home gave rise to any reasonable suspicion of criminal activity. He says the almost immediate attention that officers focused on him was a violation of his Fourth Amendment rights.

The Court agrees and makes two critical findings: (1) by the time Fryt initiated the traffic stop, Arrington was no longer a passenger in the van, was on private property doing nothing suspicious, and should never have been subject to an investigation in connection with the traffic stop; and (2) even if Arrington was still a passenger when the traffic stop was initiated, Norris admitted the only focus of his investigation was to investigate Arrington for other criminal activity. For this, he did not have the reasonable, articulable suspicion necessary for a continued investigatory detention. Under either scenario, Arrington was unreasonably seized in violation of the Fourth Amendment and is entitled to suppression of evidence.

## C. Arrington Was Not a Passenger in the Van at the Time of the Traffic Stop

The law is clear that passengers are considered seized during a traffic stop. *Brendlin*, 551 U.S. at 263. Typically, officers may check the passenger's license, determine whether there are any outstanding warrants against the driver, and inspect the automobile's registration and proof of

insurance. *Delaware v. Prouse*, 440 U.S. 648, 658-59 (1979); *Smith*, 601 F.3d at 542.

However, Fryt testified that he did not stop the Windstar on the street. He followed it into a driveway. He did not turn on his lights until the Windstar was in the driveway and Arrington was out of the car, headed to the front porch of the Dewey Street house.

Based on the testimony of Fryt, the Court finds that Arrington was not a passenger when the traffic stop was initiated, and he was on the porch when Fryt spoke to the driver. Accordingly, Fryt had no basis to seize Arrington for purposes of investigating the traffic stop.

With this finding, it is not even necessary to discuss the scope of the intrusion, whether the traffic stop was unreasonably extended, or whether officers had reasonable suspicion that Arrington was otherwise engaged in criminal activity. Arrington's initial seizure in connection with the traffic stop was unlawful.

### D. Unreasonable Extension of Time for Traffic Stop

Even if Arrington was a passenger when Fryt initiated the traffic stop, Norris admitted the primary focus of his investigation was not to complete the mission of the stop, but rather to assist in anything Fryt may need in

providing officer safety. His purpose and focus then shifted to Arrington for unrelated criminal activity.

When he arrived at the scene, Norris asked Arrington who lived at the residence. Arrington said it was his "girl's uncle (sic) dad" house; then – when Norris said it did not make sense – Arrington said it was his "girl's dad (sic) uncle" house. Norris did not believe this to be suspicious – only an "odd way" to describe who lived at the house. Arrington said he was nervous and did not want to speak with officers.

Norris ignored Arrington's request; he continued his questioning and moved closer and closer to Arrington by approaching the front porch. When Arrington turned to the door, Norris observed a bulge in Arrington's sweatshirt pocket. He could not tell what it was. Norris said he was concerned it might be a weapon. So, he asked Arrington. In response, Arrington lifted his sweatshirt to the waistband. No weapon was in his waistband. Arrington did not show what was in his pocket. Norris then shined his flashlight and he could see a bag in Arrington's pocket. Norris could not tell what it was initially, but came to believe it was marijuana. Fryt even testified that Arrington told them he had marijuana, and also it was legal for him to have it. All of this happened while Norris was about 10-12 feet from Arrington on a well-lit porch.

By then, Fryt had finished searching the name "Tony Smith," and found no results. Fryt returned to the front lawn and asked Arrington if he had ever had a driver license. Arrington said "no."

Norris was now standing within arm's reach of Arrington on the porch. Arrington became irritated and said the officers should only be questioning the driver, and that he understood his rights. He could be heard on the video talking to someone to come and open the front door.

Norris testified that after he saw marijuana in one pocket and asked Arrington about it; Arrington reached into the other pocket – Norris says this was to divert Norris' attention from the pocket Norris was interested in. From the pocket Norris was interested in, Arrington pulled out a candy or granola bar.

Arrington was still trying to knock on the front door. When he turned, Norris says he observed what appeared to be two baggies in Arrington's pocket. Norris continued to question Arrington, who reached into his pockets. Norris told him not to do that. When Arrington pulled his hands from his pockets, Norris stated he saw what looked like an "8-ball." Norris attempted to arrest him, but Arrington pulled away and jumped off the porch. Fryt immediately tackled him and made the arrest.

After securing Arrington, Norris asked him if he had any dangerous items that officers would find during a pat down search. Arrington said he had a pistol in his pocket. Fryt removed a Smith and Wesson 9mm pistol, loaded with 8 rounds of ammunition. Officers later discovered the pistol had been reported stolen. Officers also found $895, 19.2 grams of crack cocaine, and 6.2 grams of marijuana in Arrington's pockets. They recovered a bottle of promethazine on the sidewalk near where Fryt tackled Arrington.

Officers took Arrington to a patrol car and informed him of his *Miranda* rights. Arrington said he understood his rights and that he would talk to Norris. Norris says he did not observe anything that would lead him to conclude that Arrington was intoxicated. Arrington told Norris: (1) his 'girl's uncle" lived at the home; (2) the substance in the bag was crack cocaine; and (3) he found the crack cocaine on the street.

Officers booked Arrington in the Jackson County jail. As part of the intake process, Norris administered a breathalyzer test to Arrington. The test indicated no alcohol in Arrington's system. On cross examination, Norris acknowledged that the test would not detect marijuana or the promethazine (cough syrup) that Arrington says he took.

Case law that has developed in this area does not address the situation at hand: where two officers, in essence, conduct parallel investigations during a traffic stop. While Fryt gathered information to investigate the reason for his traffic stop, Norris began a criminal investigation of Arrington.

The focus of courts has been on whether the stop was extended and whether there are articulable suspicions to do that. That law is clear: to detain a motorist any longer than is reasonably necessary to issue a citation, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct ; without that, all of the officers' actions must be "reasonably related in scope to circumstances justifying the original interference." *United States v. Hill*, 195 F. 3d 258, 264 (6th Cir. 1999); *Townsend,* 305 F. 3d at 541.

It cannot be said that the driver and Arrington were detained any longer than was reasonably necessary for Fryt to issue a citation. Fryt was still involved in investigating the traffic stop when Norris questioned Arrington. Fryt had not yet returned the driver's license and registration when the situation developed on the porch involving Arrington and Norris.

But, the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's mission – which should be to address the

traffic violation that warranted the stop and to attend to safety related concerns. *Illinois v. Caballes,* 543 U.S. 405, 407 (2005); *United States v. Sharpe,* 470 U.S. 675, 682 (1985); *Johnson*, 555 U.S. at 331. The traffic stop can be unlawfully extended beyond its original purpose, even if the officer never formally completes the citation. *United States v. Blair*, 524 F. 3d 740, 752 (*6th Cir. 2008); *United States v. Urrieta,* 520 F. 3d 569, 572 (6th Cir. 2008).

In both *Caballes* and *Johnson*, the Supreme Court held that the Fourth Amendment tolerated certain, unrelated investigations that did not lengthen the roadside detention. *Caballes,* 543 U.S. at 407; *Johnson*, 555 U.S. at 330. In *Mimms*, the Court stated that the officer safety interest stemmed from the danger to the officer associated with the traffic stop itself. *Pennsylvania v. Mimms,* 434 U.S. 106, 110–11 (1977). In *Rodriguez*, the Supreme Court seemed to distinguish between on scene investigations for the purpose of officer and highway safety, and gave its imprimatur to extensions of time for those purposes. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015) ("[h]ighway and officer safety are interests different in kind from the government's endeavor to detect crime in general or drug trafficking in particular."). *Rodriguez* also debunked the Government's argument that, if officers complete all traffic related tasks expeditiously, "bonus time" can be

earned to pursue an unrelated investigation. *Id.* at 357. The critical question is whether the officer's action prolongs – i.e., adds time to – the stop. *Id.* (citing *Caballes,* 543 U.S. at 407).

In *Stepp*, the court held a traffic stop is not "measurably" extended by extraneous questions, even when such questioning undeniably prolongs the stop to a minimal degree. *Stepp,* 680 F.3d at 662 (citing *United States v. Everett,* 601 F.3d 484, 490 (6th Cir.2010)). To evaluate the reasonableness of prolonging a stop, the Court must consider the totality of the circumstances, which requires considering both the duration of the extraneous questions and its subject matter. *Everett,* 601 F.3d at 494.

Norris questioned Arrington for around five minutes. None of these questions pertained to anything necessary to complete the traffic citation. This Court relies on the reasoning in *Stepp* to conclude that five minutes of questioning measurably prolonged the traffic stop beyond its original purpose because Norris' extraneous questions lasted a substantial amount of time. *See Stepp*, 680 F.3d at 663. Norris testified that he did no investigation of Arrington related to the traffic stop. Based on *Stepp* and Norris' testimony, none of the questions had to do with the mission of the traffic stop; all were directed to other criminal conduct that Norris suspected.

Even if five minutes of extraneous questioning alone did not unreasonably prolong the search – because Norris questioned Arrington simultaneously while Fryt conducted a proper investigation – Norris' subsequent actions undeniably did. In *Stepp*, the district court concluded that the backup officer was reasonably investigating the license-plate mismatch during the downtime. The Sixth Circuit concluded that there was no evidence of the investigation the district court spoke of. It held that there was an unreasonable expansion of the investigation time. *Stepp,* 680 F.3d at 663.

In sharp contrast to *Stepp*, this Court knows exactly what Norris – the backup officer – was doing: he admittedly did not ask any questions about the traffic investigation.  While not prolonged by the addition of time, the original traffic investigation was certainly unreasonably expanded. *Rodriguez* cautions that the reasonableness of the stop depends on what the police officer in fact does. *Rodriguez*, 575 U.S. at 357 (citing *Knowles*, 525 U.S. at 115-17). Norris – in fact – engaged in an investigation unrelated to the traffic stop.

Thus, unless an independent reasonable suspicion of criminal activity arose during Norris' conversation with Arrington, continuing to detain Arrington amounted to a Fourth Amendment violation.

## 1. The Duration and Scope of Norris' Questions

In concluding that Arrington was engaged in criminal activity, Norris testified that he relied upon *only* three things: (1) Arrington attempted to divert attention from himself by speaking loudly; (2) Arrington would not tell Norris what was in his pockets; and (3) Norris noticed an "irregular bulge" in Arrington's pocket.

In deciding whether an officer conducting a traffic stop has developed a reasonable suspicion of criminal activity, the court must consider the totality of the circumstances. *United States v Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). The officer must point to "specific and articulable facts" that are more than an ill-defined hunch. *Id.* The court examines each of the factors Norris testified to at the suppression hearing that he relied upon to develop reasonable suspicion.

### a. Attempting To Distract Norris by Speaking Loudly

According to Norris, Arrington stated he was nervous, "started to become extremely agitated," and began yelling that he knows the rights afforded to him when Norris began to question him.

An officer may reasonably conclude that such behavior goes beyond the ordinary nervousness one might expect from interacting with an authority figure. *See Illinois v. Wardlow,* 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

But nervousness "is an unreliable indicator" of someone's dangerousness, "especially in the context of a traffic stop." *Richardson,* 385 F.3d at 630; *see, e.g., United States v. Wilson,* 506 F.3d 488, 495-96 (6th Cir.2007) ("Nervous behavior, standing alone, is not enough to justify a *Terry* search."); *United States v. Henry,* 429 F.3d 603, 613 (6th Cir. 2005) ("[W]e have repeatedly discounted the value of nervousness in the reasonable suspicion calculus.").

Officer Norris did not testify that Arrington became noticeably more nervous as time progressed. In fact, Arrington's agitation with officers seemed to result from his repeated requests that they terminate his encounter when he informed them that he understood his legal rights.

Just as numerous courts have stated nervousness cannot be a reliable indicator of criminal activity, loudly asserting one's right to terminate an encounter with officers does not provide reasonable suspicion for continued investigation of suspected criminal activity.

### b. Diverting Attention From His Pockets By Not Following Simple Commands

The Court outlined above what Norris says Arrington did to divert his attention: when he asked Arrington about what was in one pocket, Norris went into another pocket and pulled out a granola or candy bar. Although the Supreme Court held that a person's outward, ostensibly evasive behavior may be relevant to a reasonable suspicion inquiry, it is only one factor to be considered by the court. *See Wardlow,* 528 U.S. at 124.

Norris testified that Arrington's "inability to follow simple commands" and "hand movements" formed a basis for reasonable suspicion. Yet, where a defendant placed his hands in his pockets and walked away from police – without furtive movements or "digging" in his pockets – the court found it was not reasonable for police to believe the defendant presented a threat. *See Unites States v. Patterson*, 340 F.3d 368, 371 (6th Cir. 2003). Similarly, there was no reasonable belief of a threat where a defendant placed his hands in his pocket and continued to walk away after an officer requested that he stop. *United States v. Davis*, 94 F.3d 1465, 1468-69 (10th Cir. 1996). Here, Arrington did not make any furtive movements; nor did he attempt to dig into his pockets when officers asked him not to do so.

While Officer Norris testified that Arrington failed to comply with his commands, body camera video indicates otherwise. Arrington adhered to officers' requests: (1) for his name; (2) for his relation to the property owner; (3) to see items in his pocket; and (4) to lift up his sweatshirt so officers could see that he did not have a weapon concealed in his waistband. This sequence of events substantially discounts the assertion that Arrington failed to follow basic commands or attempted to divert Norris' attention from his pockets. Accordingly, the Court gives little weight to this in the reasonable-suspicion calculus.

### c. Observing a Bulge in Arrington's Pocket

The Government argues that, when combined with the other facts, Arrington's "irregular bulge" established reasonable suspicion of unlawful activity. The Court disagrees.

An inquiry into reasonable suspicion looks for objective and particularized indicia of criminal activity. *United States v. Beauchamp,* 659 F.3d 560, 571 (6th Cir. 2011). Looking at the totality of the circumstances, Norris did not have reasonable suspicion when he saw a bulge in Arrington's pocket that would lead him to be immediately concerned that the bulge was a weapon. In fact, Norris testified that he could not tell what it was and

allowed Arrington to remove the marijuana from his pocket. *United States v. Delano*, 543 F. Supp. 2d 791, 801 (N.D. Ohio 2008) (officer did not have reasonable suspicion to frisk for safety related reasons upon observing bulge in defendant's pocket because officer allowed defendant to remove drugs from her own pocket); *But see United States v. Stennis*, 457 F. App'x 494, 499 (6th Cir. 2012) ("The officer's perception of a bulge suspected to be a weapon provides reasonable suspicion that the individual may be armed and dangerous.")

The Government relies on *United States v. Smith*, 574 F.2d 882, 885 (6th Cir. 1978), in support of the contention that Norris had reasonable suspicion to further investigate Arrington upon observing a bulge in his pocket. In *Smith*, the appellant voluntarily consented to a search of her purse after being escorted to a DEA office in an airport, and the Government did not argue that "the search of the Appellant was justified by a reasonable fear that Appellant was armed." *Id.* at 887.

Here, Norris testified that his role was to assist "Officer Fryt in anything he may need in providing officer safety." Upon initially observing the bulge, Norris stated that he had a safety concern. However, Norris never asked Arrington if he had a weapon on him after Arrington complied with Norris' request to lift his sweatshirt and did not observe any weapons in Arrington's

waistband. Norris also did not testify that he observed a gun-shaped bulge. Norris' questions focused solely on the contents of the baggies sticking out of Arrington's pocket; he testified that he "clearly saw a bag" of marijuana when he shined his flashlight to Arrington's pocket. Norris lacked reasonable suspicion to believe that Arrington posed a threat to officers' safety because an unidentified bulge is insufficient to indicate the presence of a weapon, and the officers were not responding to a crime involving a weapon. *See Harris v. City of New York*, 2017 WL 59081, at *2 (E.D.N.Y. Jan. 4, 2017) (citation omitted).

Norris did not have a subjective belief that the bulge in Arrington's sweatshirt pocket constituted a serious threat to him, nor did he have reasonable suspicion based on articulable facts that the bulge might be a weapon which could threaten his safety. The presence of a bulge in Arrington's pocket – without additional factors to justify reasonable suspicion – did not provide Norris with reasonable suspicion to further investigate.

The three claimed reasons for suspecting Arrington of criminal activity are not sufficiently significant as a matter of law. They are not inherently suspicious. They all are subject to significant qualification. Importantly, Norris did not testify that, in his experience, any of the three factors he relied upon are linked to more extensive criminal activity. That means these factors are

unrevealing of reasonable suspicion in the absence of testimony about the activity's linkage to criminal conduct. *See Townsend*, 305 F.3d at 542.

Norris testified to observing other things, such as that occupants of the Windstar were outside the vehicle, apparent confusion about who lived at the Dewey Street address, and whether Arrington went to 7/11 or Steak 'n Shake. However, when the Court specifically questioned him about what he relied upon to find reasonable suspicion, Norris did not mention these suspicions. Therefore, the Government cannot assert, nor may the Court consider, Norris' own observations as the basis for reasonable suspicion outside his testimony. *United States v. Craig,* 306 F. App'x 256, 260 (6th Cir. 2009)("[r]easonable suspicion can be gleaned from the investigating officer's own direct observations.").

Finally, none of the factors Norris relied upon is accompanied by more suspicious factors that Norris pointed to. The totality of the circumstances demonstrates that Norris did not have a reasonable suspicion that Arrington was engaged in criminal activity or that criminal activity was afoot.

### E. Arrington's "Flight" Did Not Purge the Taint From Any Unlawful Seizure

The Government argues that – even if the initial seizure was unlawful – police had probable cause to arrest Arrington for his flight, purging the taint from any unlawful seizure. This argument is meritless.

"The 'fruit of the poisonous tree' doctrine ... bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Pearce,* 531 F.3d 374, 381 (6th Cir. 2008).

To assess whether evidence is fruit of the poisonous tree, a court must consider whether "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon the evidence by the original illegality." *United States v. Crews,* 445 U.S. 463, 471 (1980).

The Supreme Court identified three factors to guide this inquiry: (1) the amount of time between the illegality and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the illegal conduct. *See Brown v. Illinois,* 422 U.S. 590, 603–04 (1975). "No single factor in this analysis is dispositive of attenuation." *Beauchamp,* 659 F.3d at 573.

For the reasons discussed below, the evidence that the officers seized from Arrington is the fruit of the poisonous tree.

### 1. Amount of Time Between the Illegality and the Discovery of Evidence

"There is no 'bright line' test for temporal proximity." *United States v. Wolfe,* 166 Fed. Appx. 228, 234 (6th Cir. 2006) (quoting *United States v. Reed,* 349 F.3d 457, 463 (7th Cir. 2003)). However, the Sixth Circuit held that the discovery of evidence was not attenuated from unlawful police conduct where only a few minutes passed between the conduct and the discovery. *See, e.g., United States v. Lopez–Arias,* 344 F.3d 623, 630 (6th Cir. 2003) (taint of illegal conduct not attenuated by lapse of 30 minutes); *United States v. Richardson,* 949 F.2d 851, 859 (6th Cir. 1991) (taint of illegal conduct not attenuated by lapse of 20 minutes).

The record is clear that Arrington's encounter with officers – i.e., the time between his unlawful detention and discovery of the evidence – was a matter of minutes. This insignificant lapse of time is insufficient to attenuate the taint of unlawful conduct.

### 2. Presence of Intervening Circumstances

"[T]he type of intervening events that serve to attenuate police misconduct are those that sever the causal connection between the illegal

[seizure] and the discovery of the evidence." *United States v. Shaw,* 464 F.3d 615, 628–29 (6th Cir. 2006). The Government contends that Arrington's flight from the officers was an intervening circumstance that severed the causal connection between officers' conduct and the discovery of the evidence. The Court disagrees.

The Government cites *United States v. Allen,* 619 F.3d 518 (6th Cir. 2010), in support of its argument. In *Allen,* the Sixth Circuit said that "if a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the suspect for that crime." *Id.* at 525 (internal citation omitted). The Government also cites unpublished Sixth Circuit cases. *See United States v. King*, 466 Fed. Appx. 484 (6th Cir. 2012) (declining to suppress evidence where defendant's high-speed vehicular flight from an allegedly illegal stop gave officers probable cause to arrest him for a new, independent crime); *United States v. Castillo,* 238 F.3d 424, 2000 WL 1800481 (6th Cir. Nov. 28, 2000) (unpublished) (same); *United States v. Jefferson,* 182 F.3d 919, 1999 WL 519298 (6th Cir. July 15, 1999) (unpublished) (declining to suppress evidence where defendant used force against officer while fleeing from allegedly unlawful stop).

The Government says Arrington committed a new crime when he fled from the officers. Specifically, the Government argues that Arrington violated Mich. Comp. Laws § 750.81d(1), which prohibits an individual from "resist[ing], obstruct[ing], oppos[ing], or endanger[ing] a person who the individual knows or has reason to know is performing his or her duties." The Government argues, even if officers' continued detention of Arrington was unlawful, Arrington's flight violated M.C.L. § 750.81d(1) and therefore purged the taint of officers' conduct.

The Government's argument is without merit; Arrington did not violate M.C.L. § 750.81d(1). That provision prohibits an individual from resisting or obstructing only lawful police conduct. *See, e.g.,* M.C.L. § 750.81d(7)(a) ("As used in this section ... '[o]bstruct' includes the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command") (emphasis added); *People v. Moreno,* 491 Mich. 38, 814 N.W.2d 624, 629 (Mich.2012) (holding that M.C.L. § 750.81d(1) "did not abrogate the [common-law] right to resist unlawful police conduct"). Thus, Arrington did not violate M.C.L. § 750.81d(1) when he resisted unlawful police conduct. And, Arrington's flight from unlawful detention was not a violation of M.C.L. § 750.81d(1).

This case is also distinguishable from *Allen, King, Castillo,* and *Jefferson*. In those cases, the Sixth Circuit held that the defendant's flight following an unlawful initial seizure did constitute an intervening act. But, the defendants fled the allegedly unlawful stop in a manner that gave the officers probable cause to believe that the suspect committed a new, distinct crime. *See Allen,* 619 F.3d at 526 (defendant "attempt[ed] to escape from police by leading the officers on a high-speed chase," which "constituted a new, distinct crime"); *King,* 466 Fed. Appx. at 486 (officer observed defendant commit numerous violations during a high-speed vehicular flight); *Castillo,* 2000 WL 1800481, at *6 (defendant used a motor vehicle to "recklessly" flee in apparent violation of traffic laws); *Jefferson,* 1999 WL 519298, at *4 (defendant used force against officer while fleeing). Those cases are distinguishable because Arrington's flight did not constitute a new crime.

Norris' discovery of the evidence flowed directly from his unlawful detention of Arrington. Arrington's flight was not a new, distinct crime. Under these circumstances, the taint of the unlawful detention was not purged by Arrington's flight.

### 3. Purpose and Flagrancy of the Illegal Conduct

The purposefulness and flagrancy of an officer's conduct is important to the fruit of the poisonous tree analysis. "[T]he purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant 'in the hope that something might turn up.'" *Williams,* 615 F.3d at 670 (quoting *Brown,* 422 U.S. at 605). An officer's conduct is flagrant if it violates well-established legal rules. *See, e.g., Gross,* 662 F.3d at 405–06. However, a finding of "purposeful and flagrant misconduct is not limited to situations where the police act in an outright threatening or coercive manner." *Shaw,* 464 F.3d at 630 (internal punctuation omitted).

Norris' continued detention of Arrington was investigatory; at no point did Norris attempt to ask any questions regarding the traffic stop. He continued to question and eventually detained Arrington on the porch to investigate if criminal activity was afoot. Norris' testimony makes clear that he continued to detain Arrington in hopes that something would turn up. *Brown,* 422 U.S. at 605. His conduct was purposeful.

Further, Noriss' continued detention of Arrington was unlawful. A police officer must end a *Terry* stop as soon as his reasonable suspicion evaporates. *See Davis,* 430 F.3d at 357. As the Court previously discussed, Norris did not have reasonable suspicion to detain Arrington.

For all of these reasons, the evidence that the officers seized from Arrington is the fruit of the poisonous tree.

## IV.    CONCLUSION

Norris detained Arrington in violation of the Fourth Amendment. This invalid detention tainted the search. All the evidence seized in the search from Arrington is inadmissible.

The Court **GRANTS** Arrington's Motions to Suppress: (1) Evidence Based on Illegal Search and Seizure [ECF No. 24]; and (2) Post Arrest Statements [ECF No. 25].

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  February 19, 2020